**In the Matter of the Denial of Certification of the Variance Granted to David HASLUND by the City of St. Mary's Point.**

**No. A08–427.**

Supreme Court of Minnesota.

April 29, 2010.

Bradley J. Gunn, Malkerson Gilliland Martin, LLP, Minneapolis, MN, for appellant David Haslund.

Lori Swanson, Attorney General, David P. Iverson, Kimberly Middendorf, Assistant Attorneys General, St. Paul, MN, for respondent Commissioner, Minnesota Department of Natural Resources.

## OPINION

MEYER, Justice.

This case examines the Minnesota Department of Natural Resources' (DNR) intervention in local land-use decisions under the Lower St. Croix Wild and Scenic River Act (Lower St. Croix Act). At issue specifically is whether the DNR may enforce Minn. R. 6105.0380, subp. 2(B) (2009), prohibiting a proposed development, when the DNR approved the city's Bluffland/Shoreland Management Ordinance § 602.02 (1978) (BSM ordinance), which permits the same proposed development. The administrative law judge (ALJ) in this case concluded that the DNR properly enforced the state rule, and the DNR adopted the ALJ's conclusion. The court of appeals affirmed the agency's decision. We reverse.

*Regulatory Framework*

In 1968, Congress enacted the National Wild and Scenic Rivers Act to protect and preserve rivers of outstanding natural, cultural, and recreational value. Pub. L. No. 90–542, § 1(6), 82 Stat. 906 (codified as amended at 16 U.S.C. §§ 1271–1287 (2000)). Four years later, Congress designated the Lower St. Croix as a wild and

scenic river under the Federal Act. Pub. L. No. 92–560, §§ 3–6, 86 Stat. 1174 (codified at 16 U.S.C. § 1274(9) (2000)). Pursuant to federal law, Minnesota enacted the Lower St. Croix Act to administer related policy under state law. *See* Act of Apr. 6, 1990, ch. 391, art. 6, § 40, 1990 Minn. Laws 604, 604–05; Minn.Stat. § 103F.351 (2008). The Lower St. Croix Act required the DNR to propose statewide standards, consistent with federal and state objectives, to protect the river. Minn.Stat. § 103F.351, subds. 2, 4; *see also* Minn. R. 6105.0351–.0440 (2005). Accordingly, the DNR promulgated several state rules embodying protective standards that correspond to the objectives of the Lower St. Croix Act. *See* Minn. R. 6105.0351–0440.

Under this framework, the DNR adopted Minn. R. 6105.0380, subp. 2 ("the state rule"), which reads:

> **Substandard lots**: Lots recorded in the office of the county register of deeds prior to May 1, 1974, that do not meet the requirements of subpart 3, may be allowed as building sites when:
>
> . . . .
>
> B.   the lot has been in separate ownership from abutting lands since May 1, 1974.

Generally, the state rule establishes that lots less than one acre are "substandard" and therefore are undevelopable without a variance. *See id.,* subp. 3. Subpart 2 of the state rule creates an exception for substandard lots that were recorded before the enactment of the rule in 1974. This exception does not apply and the substandard lot remains unbuildable if the substandard lot has been owned in combination with an adjacent lot after 1974. *See id.,* subp. 2(B). In that case, a substandard lot is buildable only with a variance or when combined with adjacent lots to create a parcel that is not substandard. *See*

Minn. R. 6105.0520. *See also* Minn. R. 6105.0380, subp. 3.

The Lower St. Croix Act contemplates enforcement of state rules through local ordinances. *See* Minn.Stat. § 103F.335, subd. 1(c) (2008). The Act directs the DNR to develop a comprehensive master plan establishing protective standards and to make the plan available to affected municipalities. *See* Minn.Stat. § 103F.351, subd. 2(b). The DNR is required to assist municipalities in preparing, implementing, and enforcing the plan's standards through local ordinances. *See* Minn.Stat. § 103F.335, subd. 1(c). In turn, municipalities must adopt or amend their local ordinances to comply with state standards as embodied in rules promulgated under the Lower St. Croix Act. *See* Minn.Stat. § 103F.335, subd. 1(a) (2008).

Next, municipalities must submit, and the DNR must review, Lower St. Croix Act local ordinances. *See* Minn.Stat. § 103F.221, subd. 1(a) (2008). Upon review, the DNR must determine whether a local ordinance is in "substantial compliance" with the state's standards. Minn. Stat. § 103F.221, subd. 1(a)(1). If the DNR determines that a local ordinance is not in "substantial compliance," it must notify the municipality and state the changes necessary to bring the ordinance into compliance. Minn.Stat. § 103F.221, subd. 1(b) (2008). The municipality must make the changes within a year; if not, the DNR is authorized to adopt a complying ordinance for the municipality. Minn.Stat. § 103F.221, subds. 2(a)(3), 2(b) (2008).

According to statutory requirement, the DNR worked with the United States Department of the Interior and the Wisconsin Department of Natural Resources to develop protective standards for the Lower St. Croix. *See* Minn.Stat. § 103F.351, subd. 2(a). The State developed rules incorporating standards for minimum lot

size, setback requirements from water and bluff lines, and approved land uses. *See* Minn. R. 6105.0351–.0550 (2005).

The applicable local ordinance in this case, the BSM ordinance, was also enacted and approved according to statutory requirements. On August 24, 1976, the Washington County Planning Commission staff developed a model ordinance for administering state rules relating to the Lower St. Croix Act. On September 28, 1976, the DNR notified the Washington County Board that the BSM ordinance was in "substantial compliance" with state rules and master plan and even complimented those who worked on the BSM ordinance "for a job well done." Pursuant to DNR approval, the City of St. Mary's Point (the City), where the undeveloped lot at issue is located, adopted the BSM ordinance in 1978.[1] Thus, the state rule applies to the undeveloped lot through the City's codification of the BSM ordinance.[2]

The BSM ordinance contains a section corresponding to the lot size and common ownership provisions of the state rule. Like the state rule, the BSM ordinance provides that lots measuring less than one acre are "substandard," and therefore undevelopable without a variance. BSM Ordinance §§ 302.01(19), 402.01 (1978). Regarding common ownership, section 602.02 of the BSM ordinance further provides:

> If in a group of contiguous *platted* lots under a single ownership, any individual lot does not meet the minimum requirements of this Ordinance, such individual lot cannot be considered as a separate parcel of land for purposes of sale or development, but must be combined with adjacent lots under the same ownership, so that the combination of lots will equal one (1) or more parcels of land each meeting the full minimum requirements of this Ordinance.

(Emphasis added.) Thus, both the state rule and the BSM ordinance prohibit development of substandard adjacent lots owned jointly after 1974. Their only difference is that the BSM ordinance applies only to "platted" lots while the state rule applies to all lots. This "platted" distinction between the state rule and the BSM ordinance frames the central issue in this case.

## Facts and Procedural History

The present case focuses on the development of an undeveloped lot (Lot A) owned by appellant David Haslund (Haslund). Lot A, located at 2959 Itasca Avenue South, St. Mary's Point, measures .54 acres and is unplatted. The Haslund family has owned Lot A since 1943 when it was acquired by Haslund's grandparents. Haslund's grandparents conveyed Lot A to Haslund's parents in 1974. Then, in 2000, Haslund's mother conveyed Lot A to Haslund. Haslund still owns Lot A today.

The Haslunds also owned an adjacent substandard lot for several years. Haslund's mother owned the adjacent lot from 1974 until 1986 when she conveyed it to Haslund. Haslund owned the adjacent lot

---

1. The DNR issued a rule requiring DNR certification of variances to local ordinances enacted pursuant to the Lower St. Croix Act. *See* Minn. R. 6105.0540, subp. 1(B) (2005). Appellant makes no challenge regarding the question of whether the DNR has statutory authority to certify individual land use decisions. We do not reach the issue of whether the DNR exceeded its statutory authority in this case because we hold that the ordinance is in "substantial compliance" with state standards.

2. The record does not reflect the process by which the City adopted the BSM ordinance developed by Washington County. Because neither party disputes that the City's local ordinance reflects the County's model ordinance, we treat the two as equivalent.

from 1986 until 2004, when he sold it to a third party. Overall, Haslund's mother owned both lots from 1974 until 1986, and Haslund owned both lots from 2000 to 2004.

On May 3, 2000, just after acquiring Lot A, Haslund asked the city council to approve a variance to develop Lot A. After the meeting, the City's mayor called the DNR to discuss the proposed variance. DNR hydrologist Molly Shodeen stated that she did not see a problem with the variance but she did not know at the time that Haslund also owned the adjacent lot. The City granted Haslund's variance to develop Lot A on the condition that he begin building within two years. Haslund started to build a retaining wall and fence, initiated building plans, and obtained a permit to install a septic system, but did not apply for a building permit or start building his home. He sold the adjacent lot in 2004.

In 2006, Haslund asked the City to "clarify" his 2000 variance to develop Lot A, effectively renewing it. The City granted his request on October 12, 2006, and asked the DNR to certify the renewed variance. After learning that Haslund had owned a lot adjacent to Lot A from 2000 to 2004, the DNR denied its certification to the variance based on Haslund's past ownership of the adjacent lot. In a letter dated November 15, 2006, the City reported that the variance granted by the 2000 city council was intended to grant a variance for the adjacent lot issue.[3] In a letter dated November 16, 2006, DNR hydrologist Dale Homuth told the City that Lot A is undevelopable because it is substandard and has not been owned separately from adjacent lots after 1974. Because Lot A's

proposed development would violate the standards in the DNR rule, Homuth explained, the DNR denied certification of the variance.

Haslund appealed the decision to the DNR, seeking review by an ALJ. In March 2007, the DNR initiated a hearing process to handle the appeal, and in June 2007, Haslund and the DNR submitted cross-motions for summary disposition. In September 2007, the ALJ concluded that the DNR properly enforced the state rule, and recommended that the Commissioner affirm the DNR's denial of the variance granted to Haslund by the City. The DNR adopted the ALJ's findings and conclusion.

The court of appeals affirmed the agency's decision. The court held that the state rule preempted the BSM ordinance to the extent the two conflict. *In re Denial of Certification of Variance Granted to Haslund*, 759 N.W.2d 680, 688 (Minn.App. 2009) (invalidating the BSM ordinance to the extent that it conflicts with the state rule). The court also held that, as modified by rule, the BSM ordinance applied to Lot A and required a variance. *Id.* In its discussion, the court also addressed the DNR's 1976 approval of the BSM ordinance as being in "substantial compliance" with state standards. *Id.* at 688–89. The court wrote:

> [Haslund] argues that he relied on [the agency's] certification of the city's BSM ordinance as being "in substantial compliance" with DNR's rules. Therefore, [Haslund] argues, [the agency] is estopped from arguing that section 602.02 is not compliant with DNR's rules. "Substantial" means "considerable in importance, value, degree, amount, or extent." *The American*

---

3. The 2000 variance granted by the City does not reference the prohibition against development of substandard adjacent lots owned together after 1974; nor do the October 12,

2006, city council meeting minutes reflect whether the city council addressed the common ownership issue in renewing the variance.

*Heritage Dictionary* 1727 (4th ed..2006). [DNR's] certification of the city's BSM ordinance as being "in substantial compliance" with DNR rules was a representation that the BSM ordinance complied with DNR's rules to a considerable extent, and not a representation that the city's BSM ordinance was wholly in compliance with DNR's rules or that any land-use decision made by the city under the BSM ordinance would necessarily comply with those rules. To the extent that [Haslund] relied on [DNR] certification of the city's BSM ordinance to his detriment, he has not shown that this reliance was reasonable, particularly where his property fit within the discrepancy between the ordinance and relevant rule.

*Id.* Effectively, the court conveyed that Haslund improperly relied on the BSM ordinance's language because the BSM ordinance was approved as being only partly, not fully, in compliance with state standards. Haslund petitioned for review of the court's decision, arguing that the plain language of the BSM ordinance did not require a variance to develop Lot A. Neither party petitioned for review on the issue of whether the DNR lacks authority to certify a city's land-use decision under the BSM ordinance.[4]

*Discussion*

■ We reverse an agency's decision when an appellant's substantial rights may have been prejudiced because the agency's decision exceeds the agency's statutory authority. Minn.Stat. § 14.69 (2008). Whether an agency's decisions exceed statutory authority is reviewed de novo. *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989).

■ Our analysis begins with the BSM ordinance. We interpret an ordinance as we would a statute. *See Chanhassen Estates Residents Ass'n v. City of Chanhassen*, 342 N.W.2d 335, 339 n. 3 (Minn.1984). Thus, when an ordinance's words are clear and free from ambiguity, we do not disregard the letter of the law to pursue the spirit of the law. *See* Minn.Stat. § 645.16 (2008). We interpret an ordinance's words according to their common and approved usage. *See* Minn.Stat. § 645.08 (2008).

■ Here, section 602.02 of the BSM ordinance applies only to "platted" lots. Lot A and the adjacent lot are both recorded in metes and bounds, and so, by definition, are not "platted."[5] Thus, section 602.02 does not apply to these lots, making a variance regarding Haslund's past ownership of the adjacent lot unnecessary. Both Haslund and the DNR agree that under the plain language of the BSM ordinance, Haslund need not obtain a variance regarding his past common ownership of the lots.

The DNR further contends, however, that Lot A still requires a variance based not on the BSM ordinance but the state rule. Indeed, the DNR's denial of certifi-

---

4. The concurrence suggests that we decide this case on an issue of law not raised in the petition for review. We generally decline to consider issues not raised in a petition for review, except as required in the interests of justice. *See* Minn. R. Civ.App. P. 103.04; *In Re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn.2005).

5. A "plat" is defined as "[a] small piece of land; ... [a] map describing a piece of land

and its features, such as boundaries, lots, roads, and easements." *Black's Law Dictionary* 1268 (9th ed. 2009). "Metes and bounds" is defined as "[t]he territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties[;] ... usu[ally] described in deeds and surveys to establish boundary lines of land." *Id.* at 1080.

cation to the City's land-use decision regarding the Lot A variance was based in part on the state rule. The agency argues that the fact that the BSM ordinance applies only to platted lots and the state rule incorporates no such limitation creates a conflict. Given the conflict, the DNR continues, the state rule is superior and therefore governs.

We look to the Lower St. Croix Act to determine whether the state rule may be deemed to be superior and enforceable against an individual proposed land use. We conclude that the DNR's attempt to enforce the state rule over the BSM ordinance in this case lacks statutory foundation. The Act does not permit the DNR to enforce the state rule in place of the BSM ordinance to achieve a desired result. Rather, the Act requires that the DNR review local ordinances during the approval process; if a local ordinance conflicts with state rule, the DNR *must* notify the municipality of changes necessary to bring a local ordinance into compliance. Minn. Stat. § 103F.221. Here, the DNR did not identify any potential conflict between the state rule and the BSM ordinance. Instead, it approved the BSM ordinance and urged its enactment.

The DNR argued and the court of appeals concluded that the DNR may enforce the state rule because the DNR approved the BSM ordinance as being in only "substantial compliance" with state standards. We disagree. First, the Lower St. Croix Act requires that a municipality adopt local ordinances "complying" with state standards; the Act does not authorize the DNR to approve a noncomplying ordinance. *See* Minn.Stat. § 103F.351, subd. 4(c). Second, the DNR is required to approve a shoreland management ordinance as being in "substantial compliance" with state standards, to notify a municipality of how to correct a noncomplying ordinance,

and to adopt a complying ordinance for a municipality when a municipality fails to do so. *See* Minn.Stat. § 103F.221, subds. 1, 2 (2008). Thus, the DNR employs the phrase "substantial compliance" here to echo statutory language, not to indicate only partial compliance with state standards. Indeed, if the DNR approved ordinances that only partly complied with state standards, landowners and developers would be left to determine which provisions were invalid, a task better suited to the agency that promulgated the touchstone standards. Moreover, the DNR itself has read the phrase "substantial compliance" as the equivalent of "compliance." *See* Minn. R. 6105.0352, subp. 2 (2009) (stating that municipalities must adopt local ordinances "in compliance" with Lower St. Croix Act state rules while referencing the statutory approval process for local ordinances). In promulgating rule 6105.0352, the DNR recognized that deeming an ordinance to be in "substantial compliance" with state standards conveyed that it was "in compliance" with state standards. Finally, if the DNR determined that the "platted" distinction contained in the BSM ordinance conflicted with state rule, the DNR was statutorily required to notify the City and suggest necessary changes. *See* Minn.Stat. § 103F.221, subd. 1(b). The agency took no such action.

For the foregoing reasons, we treat the DNR's approval of the BSM ordinance as effective and binding on the DNR. Whether the DNR intended to create a distinction between platted and unplatted lots is unknown. That the DNR did approve the "platted" distinction is certain. As with statutes, we may not disregard the plain language of an ordinance to pursue the spirit of the law. *See* Minn.Stat. § 645.16. Thus, we cannot rewrite the

BSM ordinance here to conform to the state rule.[6]

For the foregoing reasons, we hold that the Lower St. Croix Act does not authorize the DNR to enforce the state rule over the plain language of the BSM ordinance to prevent Lot A's development. Therefore, we reverse.

Reversed.

GILDEA, Justice (concurring).

I agree with the majority that Haslund should be permitted to develop his property in accordance with the variance he received from the City of St. Mary's Point (City), but I reach this result for a different reason. This case is on appeal because the Department of ·Natural Resources (DNR) refused to "certify" the variance the City granted. The DNR asserts the authority to certify local government variance decisions in its administrative rule. *See* Minn. R. 6105.0540 (2009) (requiring that local governments apply to the DNR for certification of variance decisions). I would hold that the DNR lacks the authority to certify the City's decision. *See In re Denial of Certification of Variance Granted to Hubbard,* 778 N.W.2d 313, 321 (Minn. 2010) (holding that DNR lacks express or implied authority to certify City of Lakeland's variance decision). Because the DNR lacks authority to certify, its refusal to certify is of no effect. I therefore would reverse the court of appeals.

The majority avoids the question of the DNR's authority because it holds that Haslund was not required to seek a variance from the City. Specifically, the major-ity construes BSM Ordinance § 602.02 and holds that this ordinance, by its plain terms, applies only to platted lots. Because the lot Haslund seeks to develop (Lot A) is not platted, the majority concludes that this provision does not apply to restrict Haslund's proposed development of his property, and therefore Haslund did not need a variance. But Haslund did apply for a variance, and the City granted that variance in 2000. At Haslund's request, the City "clarified" in 2006 that the variance Haslund received in 2000 remained in effect. I would not change the facts that gave rise to this case in an effort to arrive at the proper resolution. I would instead examine the issue Haslund raised on appeal in his Petition for Writ of Certiorari, which involves the DNR's refusal to certify the variance granted by the City.

Haslund petitioned for certiorari review in the Minnesota Court of Appeals arguing that "[i]n refusing certification, [the DNR] exceeded the authority conferred upon [the DNR] by the Lower St. Croix Wild and Scenic River Act of 1972." As the court of appeals acknowledged, Haslund argued that the DNR "lacks the statutory authority under the Lower St. Croix Act to independently review a city's land-use decision." *In re Denial of Certification of Haslund Variance,* 759 N.W.2d 680, 688 (Minn.App.2009). The court said it "need not consider [Haslund's] argument that the DNR lacked the authority to review the city's decision." *Id.* But, in my view, the question of the DNR's authority is a threshold question that we should resolve prior to addressing other issues also raised.

---

**6.** Rather, the DNR has authority through the Lower St. Croix Act approval process to re-form the BSM ordinance. Indeed, the record reflects that the DNR has exercised its regulatory authority to edit the language of the BSM ordinance on at least one occasion. In 1992, the DNR conditionally approved an amend-ment to section 601.03 of the BSM ordinance, subject to the City's replacing part of the amendment with language suggested by the DNR. The 1992 revision demonstrates that the DNR is familiar with the process for correcting a local ordinance that does not comply with a state rule.

As we held in *Hubbard,* the DNR lacks statutory authority to certify local government variance decisions. 778 N.W.2d at 321. I acknowledge that Haslund did not argue the authority question as precisely as he should have in his briefs to this court. But our obligation as an appellate court is "to decide cases in accordance with law, and that responsibility is not to be 'diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities.'" *State v. Hannuksela,* 452 N.W.2d 668, 673 n. 7 (Minn. 1990) (citation omitted); *see also Putz v. Putz,* 645 N.W.2d 343, 350 (Minn.2002) (noting "authority to take any action 'as the interest of justice may require'"). Consistent with this precedent, I would answer the dispositive question of law— whether the DNR had the authority to certify the City's variance. Because, as we held in *Hubbard,* the DNR does not have this authority, the DNR's refusal to certify Haslund's variance is of no effect. I therefore would reverse the court of appeals.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Gildea.